Opinion issued December 4, 2008 















In The

Court of Appeals

For The

First District of Texas






NO. 01-07-01023-CR

NO. 01-07-01024-CR

__________


LEONARD WAYNE GRIMES, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 338th District Court

Harris County, Texas

Trial Court Cause Nos. 1131405 & 1131406






MEMORANDUM OPINION

 A jury found appellant, Leonard Wayne Grimes, guilty of the offense of
possession with intent to deliver a controlled substance, namely, cocaine, weighing
more than 4 grams and less than 200 grams, (1) and the offense of possession with intent
to deliver a controlled substance, namely, phencyclidine ("PCP"), weighing more
than 4 grams and less than 200 grams. (2) After appellant pleaded true to two
enhancement allegations that he had two prior felony convictions, the trial court
assessed his punishment at confinement for twenty-five years for each offense, to run
concurrently. In four points of error, appellant contends that the evidence is legally
and factually insufficient to support his convictions and the trial court erred in
denying his motion to suppress evidence seized pursuant to a search warrant and in
charging the jury on the law of parties over his objection. 

 We affirm. Factual and Procedural Background Houston Police Officer C. Cayton testified that he received information about
a house located at 4010 Rawley in Houston and that he and Houston Police Officer
Chapman went to investigate and conduct surveillance on the house for suspected
narcotics activity. The officers, in an unmarked car, parked on the street near the
house at 2:00 p.m. and, for five to six hours, saw people arrive at the house by foot,
bicycle, and car, walk up to the front door of the house, stay for fifteen to twenty
seconds, and then leave. Based on these observations, Cayton concluded that
narcotics activity was occurring at this house and that this house functioned as a
"dope house." Cayton explained that the "primary function" of a dope house is "to
sell narcotics" and that generally dope houses have little furniture and food in them. 
Cayton noted that to determine if narcotics activity is occurring at dope houses,
officers look for people approaching and leaving these houses after staying ten to
fifteen seconds because such conduct indicates illegal activity. Cayton also noted that
in order to determine who has care, custody, and control of dope houses, officers look
for items tying people to these house, such as utility bills, photographs, identification
cards, and credit cards. 

 Officer Cayton obtained a search warrant, and, with a team of officers, returned
to the house in the early hours of the next morning to execute the warrant. When the
officers pulled up to the house to execute the warrant, Cayton saw that appellant was
standing by a car in front of the house, within approximately 10 to 15 feet of the
house. There was also a female standing next to appellant. Appellant, who was not
doing anything unusual and did not try to resist or run, was detained by uniformed
officers. Although appellant did not have any narcotics on his person, he did possess
$1,376 in cash, which was kept in a "tight roll" and was of small denominations. 
Cayton stated that it was typical for people engaged in selling narcotics to carry cash
in this manner and that the small denominations held by appellant were consistent
with the likely sales value of the narcotics ultimately located by the officers in the
house.

 As Officer Cayton approached the house, he noticed an odor of PCP coming
from "near the front door." Although the officers announced "police," no one opened
the front door, and the officers forced entry into the house. As the officers entered
the house directly into the living room, Cayton saw two men, identified as McGlory
and Porter, sitting in the room. The officers ordered the men to show their hands and
get on the ground, but Porter, who was standing within four to five feet of a dresser
located in the living room, made a "pitching motion" and threw an object, which
officers later determined to be crack cocaine. After checking his report, Cayton stated
that McGlory had also thrown narcotics when the officers entered the house. (3) 
Officers forced McGlory and Porter to the ground and performed a sweep of the
house but found no more individuals. McGlory and Porter were subsequently arrested
for possession of controlled substances with intent to deliver. Cayton explained that
they were charged with intent to deliver because, upon the officers' entry into the
house, they each threw three to four grams of crack cocaine, and an amount of crack
cocaine for personal use would be less than one gram. 

 Officer Cayton further testified that there was little furniture, clothing, or food
in the house and that it did not appear that anyone was living in the house on a
permanent basis. There was a dresser in the living room, a dresser in one of the
bedrooms, and a refrigerator and cabinets in the kitchen. In addition to the narcotics
thrown by McGlroy and Porter, officers found plastic baggies, crack cocaine, powder
cocaine, and PCP on the top of the dresser in the living room. A photograph of the
top of the dresser depicting the narcotics was introduced into evidence. The picture
shows, among other things, a bowl containing plastic baggies containing pieces of
crack cocaine, a vanilla extract bottle with PCP in it, and a jewelry box in which
officers located another bottle full of PCP and crack cocaine. The officers also found
two loaded semi-automatic firearms on top of the dresser, which Cayton stated are
used in dope houses to protect narcotics. In the top drawer of the dresser, officers
found a wallet. On the top of the wallet was a photocopy of appellant's Texas
driver's license. Cayton explained that there was no way someone could access the
wallet without noticing everything on top of the dresser. Cayton opined that the
wallet indicated appellant's care, custody, and control of the residence. Cayton also
found, attached to the mirror on the dresser, two photographs of appellant, which
indicated to Cayton a link between appellant and the house and dresser. Neither
Porter nor McGlory had any papers in the house bearing their names. 

 Officers also found a cellular telephone, more baggies, some small empty
bottles, and another vanilla extract bottle with PCP in the dresser's drawers. Cayton
explained that PCP is typically sold on the street in small bottles like those found in
the dresser for $10 to $20. Cayton also stated that the crack cocaine was packaged
in smaller quantities and ready for distribution for individual use and that these
baggies would sell for $20. 

 On the dresser in the bedroom, officers found a digital scale, baggies of
different sizes, a plate with residue of cocaine on it, and a razor blade. Based on
Cayton's experience, he concluded that the scale was used to weigh narcotics, the
razor blade was being used to cut a "crack cookie" into individual rocks for sale, and
the baggies were used for packaging the narcotics. 

 On cross-examination, Officer Cayton agreed that he did not know how long
appellant's pictures had been on the mirror and that he did not know how long the
bowl containing some of the narcotics found in the house had been on top of the
dresser. Cayton explained that the copy of appellant's driver's license on top of the
wallet did not bear the address of the dope house, appellant did not appear high, and
the officers did not test any of the bottles, baggies, the bowl, guns, or any other items
for fingerprints. (4) Cayton stated that he did not test the bags for fingerprints because
"two of the items" of crack cocaine were dropped by Porter and McGlory "so there
wasn't any question about where those came from" and Cayton "determined that the
remainder of the narcotics were in the care, custody, and control of [appellant]
because [of] the other evidence [he had] found." (5) 

 Officer Chapman testified that, during their surveillance, he and Officer Cayton
observed people throughout the day coming to the house by car, bicycle, and foot,
walk up to the house, stay for a few moments, and leave. Just prior to executing the
search warrant, at approximately 11:30 p.m. on the same day, Chapman conducted
additional surveillance for approximately thirty minutes, and, during this time, three
cars came and went from the house and a fourth car came and stayed. It appeared to
Chapman that appellant was "conducting a hand-to-hand transaction of some sort"
with the occurpants of each of the first three cars because he would exit the house, go
talk to the individual, get something from them, go back inside the house, return a
few seconds later, hand something off, and the car would leave. When the fourth
vehicle arrived, which was driven by a female, appellant came outside to talk, they
both went inside the house, they returned outside, and they had been outside for a few
minutes at the time the officers executed the search warrant. At the time the officers
executed the search warrant, appellant was standing five to eight feet from the front
of the house, in between the house and the car driven by the female. 

 Officer Lopez, who participated in executing the warrant, testified that he
detained appellant and the female outside of the house, and appellant possessed a wad
of money rolled up tightly with a rubber band. However, neither appellant nor the
female possessed any narcotics.

Legal and Factual Sufficiency

 In his third and fourth points of error, appellant argues that the evidence is
legally and factually insufficient to support his convictions because the evidence does
not "link" him to the PCP and cocaine found inside the house. 

 We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable doubt.
Vodochodsky v. State, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We note that
the trier of fact is the sole judge of the weight and credibility of the evidence.
Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when
performing a legal sufficiency review, we may not re-evaluate the weight and
credibility of the evidence and substitute our judgment for that of the fact finder.
Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any
inconsistencies in the evidence in favor of the verdict. Curry v. State, 30 S.W.3d 394,
406 (Tex. Crim. App. 2000). 

 In a factual sufficiency review, we view all the evidence in a neutral light, both
for and against the finding, and set aside the verdict if the proof of guilt is so
obviously weak as to undermine confidence in the jury's determination, i.e., that the
verdict seems "clearly wrong and manifestly unjust," or the proof of guilt, although
legally sufficient, is nevertheless against the great weight and preponderance of the
evidence. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). We
note that a jury is in the best position to evaluate the credibility of witnesses, and we
afford "due deference" to the jury's determinations. Marshall v. State, 210 S.W.3d
618, 625 (Tex. Crim. App. 2006). Although we should always be "mindful" that a
jury is in the best position to pass on the facts and that we should not order a new trial
"simply because [we] disagree[ ] with the verdict," it is "the very nature of a
factual-sufficiency review that . . . authorizes an appellate court, albeit to a very
limited degree, to act in the capacity of a so-called 'thirteenth juror.'" Watson, 204
S.W.3d at 416-17. Thus, when an appellate court can "say, with some objective basis
in the record, that the great weight and preponderance of the (albeit legally sufficient)
evidence contradicts the jury's verdict[,] . . . it is justified in exercising its appellate
fact jurisdiction to order a new trial." Id. at 417.

 A person commits the offenses of possession of a controlled substance, namely
cocaine and phencyclidine, weighing more than 4 grams and less than 200 grams, if
he knowingly or intentionally possesses the controlled substance in the prescribed
amount, by aggregate weight, including adulterants or dilutants. See Tex. Health
& Safety Code Ann. § 481.102(3)(D) (Vernon Supp. 2008) (cocaine), § 481.102(8)
(Vernon Supp. 2008) (phencyclidine), § 481.112(a), (d) (Vernon 2003). To prove
possession with intent to deliver, the State must prove that the defendant (1) exercised
care, custody, control, or management over the controlled substance, (2) intended to
deliver the controlled substance to another, and (3) knew that the substance in his
possession was a controlled substance. Id. § 481.002(38) (Vernon Supp. 2008),
§ 481.112(a); Parker v. State, 192 S.W.3d 801, 805 (Tex. App.--Houston [1st Dist.]
2006, pet. ref'd). "Possession" is "a voluntary act if the possessor knowingly obtains
or receives the thing possessed or is aware of his control of the thing for a sufficient
time to permit him to terminate his control." Tex. Penal Code Ann. § 6.01(b)
(Vernon 2003).

 Additionally, when an "accused is not in exclusive possession of the place
where contraband is found, there must be additional independent facts and
circumstances which affirmatively link the [accused] to the contraband in such a way
that it can be concluded that the accused had knowledge of the contraband and
exercised control over it." Roberson v. State, 80 S.W.3d 730, 735 (Tex.
App.--Houston [1st Dist.] 2002, pet. ref'd). "An affirmative link [is one that]
generates a reasonable inference that the accused knew of the contraband's existence
and exercised control over it." Id. "Proof of an affirmative link between the accused
and the contraband is mainly needed to establish knowledge or intent." (6) Id. 
"Whether this evidence is direct or circumstantial, 'it must establish, to the requisite
level of confidence, that the accused's connection with the drug was more than just
fortuitous.'" Poindexter v. State, 153 S.W.3d 402, 405-06 (Tex. Crim. App. 2005). 
This "is the whole" of the so-called "links" rule. (7)
 Id. at 406. 

 The Texas Court of Criminal Appeals has explained that the purpose of the
links rule is to "protect the innocent bystander from conviction based solely upon his
fortuitous proximity to someone else's [narcotics]." Id. The links rule "simply
restates the common-sense notion that a person--such as a father, son, spouse,
roommate, or friend--may jointly possess property like a house but not necessarily
jointly possess the contraband found in that house." Id. Thus, "[w]hen the accused
is not in exclusive possession of the place where the substance is found, it cannot be
concluded that the accused had knowledge of and control over the contraband unless
there are additional independent facts and circumstances which affirmatively link the
accused to the contraband." Id.

 Texas courts have identified "many non-exhaustive factors" that may
demonstrate a link to contraband. Roberson, 80 S.W.3d at 735. These factors
constitute "a shorthand way of expressing what must be proven to establish that
[narcotics] were possessed knowingly." Id. The number of linking factors present
is not as important as the "logical force" they create to prove that an offense was
committed. Id. These links include (1) the accused's presence when a search is
conducted, (2) whether the narcotics were in plain view, (3) the accused's proximity
to and the accessibility of the narcotics, (4) whether the accused was under the
influence of narcotics when arrested, (5) whether the accused possessed other
contraband or narcotics when arrested, (6) whether the accused made incriminating
statements when arrested, (7) whether the accused attempted to flee, (8) whether the
accused made furtive gestures, (9) whether there was an odor of contraband or
narcotics, (10) whether other contraband or narcotic paraphernalia was present,
(11) whether the accused owned or had the right to possess the place where the
narcotics were found, (12) whether the place in which the narcotics were found was
enclosed, (13) whether the accused was found with a large amount of cash, and (14)
whether the conduct of the accused indicated a consciousness of guilt. Evans v. State,
202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006).

 In support of his legal sufficiency challenge, appellant notes that he was not in
exclusive possession of the house where the narcotics were found and did not have
direct access to the narcotics at the time they were found. Appellant further notes that
it is undisputed that no narcotics or narcotics paraphernalia were found on him
personally, he did not make any furtive gestures or attempt to flee or resist arrest, he
made no incriminating statements, and he was not under the influence of any
narcotics. Appellant also asserts that there was no evidence that he owned the house
and that his fingerprints were not found on the bags containing the narcotics,
paraphernalia, containers, firearms, or any other items in the house. Finally, appellant
emphasizes that he was not present inside the house during the search, there were two
other men inside the living room of the house, and these men were found in
possession of narcotics. 

 Here, viewing the evidence in a light most favorable to the verdict, Officer
Cayton testified, based on his experience and training and his surveillance of the
house throughout the day, that the house in question was a dope house and that the
primary function of this house was "to sell narcotics." Cayton explained that this
house, like other dope houses, lacked any significant furnishings and that it appeared
that no one lived in the house. See Lavigne v. State, No. 01-07-00995-CR, 2008 WL
3115385, at *3 (Tex. App.--Houston [1st Dist.] Aug. 7, 2008, pet. filed) (affirming
possesion with intent to deliver conviction and noting that, although defendant was
not owner of house and did not have personal property in house, officers testified that
"only individuals actually involved in the manufacturing process or others known or
trusted by the manufacturers could gain entry" into house dedicated to manufacturing
crack). Cayton also stated, based on his training and experience, that during the
officers' surveillance of the house, he could tell that narcotics activity was occurring
at the house because, consistent with activity at other dope houses, people had been
approaching and leaving the house for very brief periods all day. Cayton explained
that this was a sign of active, illegal narcotics activity because those engaged in
illegal activity at dope houses do not want to remain at these houses for long periods
of time. Cayton further explained that since dope houses do not have permanent
occupants, officers must typically look for other items to determine the persons who
have care, custody, and control of these houses, including utility bills, photographs,
identification cards, and credit cards. Here, Cayton stated that he found two
photographs of appellant attached to the mirror of the living room dresser on which
the narcotics were found as well as a cut-to-fit photocopy of appellant's Texas
driver's license on top of the wallet inside a drawer of the dresser. See Poindexter,
153 S.W.3d at 411 (describing multiple pieces of evidence establishing that defendant
resided at house, including photograph of appellant, and concluding that based on this
evidence "[a]ny rational factfinder could conclude that appellant lived at this house"). 
The State admitted a photo of the wallet and the cut-to-fit Texas driver's license
inside the dresser as State's Exhibit 17. 

 Although it is undisputed that appellant was outside of the house at the time the
officers executed the search warrant, Officer Chapman testified that appellant was
standing less than ten feet from the front door and that appellant had exited the house
only "minutes" prior to the execution of the warrant. Importantly, Officer Chapman
noted that, in the thirty minutes prior to the execution of the warrant, appellant,
consistent with selling narcotics, had exited the house to approach cars that had
pulled up to the house, received something from the occupants of the cars and then
reentered the house, and then returned to the waiting cars and handed something to
the occupants of the cars on four occasions. Chapman opined that appellant was
conducting hand-to-hand transactions. 

 Officers also testified that at the time that they executed the search warrant,
there was an odor of PCP outside of the house and that, when appellant was arrested
in the front yard of the house, he was carrying a "rolled up wad of money" totaling
$1,376 in his pocket. Officer Cayton explained that appellant carried the wadded
cash consistent with the manner in which others engage in selling narcotics carry cash
and that the denominations carried by appellant were consistent with the likely sales
value of narcotics packaged for individual distribution. Finally, when the officers
entered the house that appellant had been in just minutes before, they found narcotics
and narcotics paraphernalia in plain view, on the living room dresser. The narcotics
paraphernalia included baggies of various sizes and small bottles, all of which would
be used to distribute both the cocaine and PCP for individual buyers. In addition to
the narcotics, Officer Cayton found two loaded semi-automatic firearms on top of the
dresser, which Cayton explained were used in dope houses to protect narcotics. The
officers' testimony established that the living room was the room that one would
immediately enter upon entering the house. 

 Officers also discovered narcotics and narcotics paraphernalia on a dresser in
the bedroom, including a scale used to weigh narcotics, a razor blade used to cut a
crack cookie into individual rocks for sale, and baggies used for packaging the
narcotics. See id. (affirming conviction and noting that officers found manufacturing
and packaging materials, including glass tubes or vials used to make crack cocaine,
razors, baggies, and a scale). 

 The circumstantial evidence outlined above, when viewed in combination,
constitutes "amply sufficient evidence connecting appellant to the actual care,
custody, control or management" of the narcotics such that a jury could reasonably
infer that appellant possessed them. Evans, 202 S.W.3d at 166. Although appellant
cites links on which the State presented no evidence, it "is the logical force of the
circumstantial evidence, not the number of links, that supports a jury's verdict." Id.
at 166. For example, appellant notes that he was outside the house at the time the
officers executed the warrant. However, the officers noted that appellant had just
exited the house within minutes of their execution of the search warrant, and Officer
Chapman explained that he had seen appellant exit and reenter the house at least three
times within the thirty minutes before the officers' execution of the warrant. With the
evidence of the obvious presence of narcotics and narcotics paraphernalia in plain
view in the living room, the officers' testimony supports affirmative findings on all
three of the important "presence," "proximity," and "plain view" links. See id. 

 We conclude that a rational trier of fact could have found, beyond a reasonable
doubt, that appellant knowingly possessed, with the intent to deliver, the narcotics.
Accordingly, we hold that the evidence is legally sufficient to establish that appellant
committed the offenses of possession of narcotics with the intent to deliver.

 Viewing the evidence neutrally, it is true that Officer Cayton testified that
appellant made no attempt to resist arrest and that appellant did not have any
narcotics or paraphernalia on him personally. Additionally, the officers did not obtain 
fingerprints from the containers of the narcotics or the paraphernalia. However, in
light of the above evidence supporting the jury's verdict, we conclude that the
evidence is not so obviously weak such that the verdict is clearly wrong and
manifestly unjust, or that the proof of guilt is against the great weight and
preponderance of the evidence. Accordingly, we hold that the evidence is factually
sufficient to establish that appellant committed the offenses of possession of narcotics
with the intent to deliver.

 We overrule appellant's third and fourth points of error.

Motion to Suppress

 In his first point of error, appellant argues that the trial court erred in denying
his motion to suppress evidence seized pursuant to the search warrant because the
officer's statements in the supporting affidavit are conclusory and are based almost
entirely on an unsubstantiated statement of a person who was already under arrest and
had a significant criminal history. Appellant asserts that he filed a first motion to
suppress on the basis that the supporting affidavit to the warrant failed to establish
probable cause. Appellant also asserts that he filed a second motion to suppress on
the basis that the supporting affidavit contained deliberate falsehoods and
demonstrated a reckless disregard for the truth. Appellant complains that the "trial
court denied appellant's trial attorney an opportunity to fully develop his claim of
false statements in the affidavits."

 An application for a search warrant must be supported by an affidavit. Tex.
Code Crim. Proc. Ann. arts. 1.06, 18.01(b) (Vernon 2005). The affidavit should set
forth the facts that establish probable cause. Id. Probable cause exists when the facts
given to a magistrate are sufficient to conclude that the object of the search is
probably on the premises at the time the warrant is issued. Cassias v. State, 719
S.W.2d 585, 587 (Tex. Crim. App. 1986); McKissick v. State, 209 S.W.3d 205, 211
(Tex. App.--Houston [1st Dist.] 2006, pet. ref'd).

 When reviewing the sufficiency of an affidavit, we do not engage in a de novo
review; instead we give great deference to the magistrate's determination of probable
cause. Swearingen v. State, 143 S.W.3d 808, 810-11 (Tex. Crim. App. 2004);
McKissick, 209 S.W.3d at 211. A search warrant is adequate when the magistrate has
a substantial basis for concluding that probable cause was shown. Swearingen, 143
S.W.3d at 810-11; McKissick, 209 S.W.3d at 212. The sufficiency of the affidavit
is determined by considering the totality of the circumstances set forth within the four
corners of the affidavit. Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332
(1983); Swearingen, 143 S.W.3d at 811. 

 Officer Cayton stated in the affidavit in support of the search warrant that "on
February 21, 2007, [he] received information regarding illegal narcotics activity at
4010 Rawley," this house was controlled by a suspect named "Red," Cayton
"proceeded to the location and conducted surveillance," and he "observed activity
consistent with illegal narcotics trafficking such as pedestrian and vehicular traffic
arriving and leaving the location." Cayton further testified that he observed a car
being driven by a man later identified as Tony Sams pull up directly in front of the
house and that Sams exited the vehicle, went inside the house, returned to his car, and
quickly left the house. Cayton stated that Sams's conduct was "consistent with illegal
narcotics trafficking," and he followed Sams. After conducting a traffic stop on
Sams, who had two open felony warrants, Sams was arrested and searched, and
officers found Sams to possess cocaine. After being read his legal rights, Sams
provided an affidavit to officers stating, among other things, that he bought two crack
cocaine rocks from "Red" at the house on Rawley and Benson, he had bought crack
from Red two times that week, and Red had twenty to thirty crack rocks in a plastic
bag at the time that Sams had purchased the cocaine. (8) Based upon this affidavit, the
magistrate issued the search warrant for the house.

 We conclude that there are facts articulated within the four corners of Cayton's
affidavit that provided the magistrate with a substantial basis to find probable cause
to issue the search warrant for the house at 4010 Rawley. (9) Accordingly, we hold that
the trial court did not err in denying appellant's first motion to suppress the evidence.

 In regard to his second motion, although appellant cites this motion and
explains the basis for it, his only specific complaint on appeal is that the trial court
denied him an opportunity to fully develop the claims made in that motion. However,
appellant does not provide a specific record reference cite to where he either
explained to the trial court the relief that he was requesting to develop the record or
where the trial court denied appellant this opportunity. Our independent review of
the record reveals that, at the conclusion of the motion to suppress hearing, the trial
court stated that it was denying appellant's second motion "at this time," but it
reserved the right to reconsider. Appellant's counsel then asked to make a bill on the
second motion "at some point in time," and the trial court agreed. To the extent our
holding affirming the trial court's ruling on appellant's first motion to suppress did
not resolve the substance of appellants' complaints as to his second motion, we
further hold that by failing to obtain a ruling from the trial court or cite this Court to
the location in the record where the trial court made the complained of ruling,
appellant has waived this complaint for our review. See Tex. R. App. P. 33.1, 38.1(h). 
 We overrule appellant's first point of error.

Jury Charge

 In his second point of error, appellant argues that the trial court erred in
charging the jury on the law of parties over his objection because there is no evidence
supporting a finding that he was a party to the offenses committed by Porter and
McGlory, who "were both charged with possessing drugs separate and apart from
those appellant was charged with." Appellant notes that, during trial, the State "took
pains" to distinguish the narcotics possessed by him and the other men. The State
does not cite to any evidence supporting a parties charge. In fact, they respond that,
assuming error, any error was harmless because there was sufficient evidence to
sustain appellant's convictions as a principal actor.

 "In general, an instruction on the law of parties may be given to the jury
whenever there is sufficient evidence to support a jury verdict that the defendant is
criminally responsible under the law of parties." Ladd v. State, 3 S.W.3d 547, 564
(Tex. Crim. App. 1999). However, even if a trial court errs in submitting a parties
instruction, when "the evidence clearly supports a defendant's guilt as a principal
actor, any error of the trial court in charging on the law of parties is harmless." Id.
at 564-65 (citation omitted). This is because if there is "no evidence tending to show
[the defendant's] guilt as a party, the jury almost certainly did not rely upon the
parties instruction in arriving at its verdict, but rather based the verdict on the
evidence tending to show [the defendant's] guilt as a principal actor." Id. at 565.

 Thus, even accepting appellant's argument that there was no evidence
presented to support a parties instruction, we hold any error by the trial court in
submitting an instruction in the jury charge on the law of parties was harmless
because, as explained above, the State presented sufficient evidence to support
appellant's convictions as a principal.

 We overrule appellant's second point of error. 

Conclusion

 We affirm the judgments of the trial court. 

 

 Terry Jennings

 Justice


Panel consists of Justices Jennings, Hanks, and Bland.


Do not publish. See Tex. R. App. P. 47.2(b).

1. See Tex. Health & Safety Code Ann. § 481.102(3)(D) (Vernon Supp. 2008), §
481.112(a), (d) (Vernon 2003); trial cause number 1131405; appellate cause number
01-07-01023-CR.
2. See id. § 481.102(8) (Vernon Supp. 2008), § 481.112(a), (d); trial cause number
1131406; appellate cause number 01-07-01024-CR.
3. Cayton more specifically testified that Porter threw approximately three grams of
crack cocaine contained in a plastic bag and that McGlory also threw three to four
grams of crack cocaine when the officers entered the house. Upon reviewing his
report, Cayton agreed that at least one of these men actually threw crack cocaine onto
the top of the dresser in the living room. Cayton also testified that he personally saw
the crack cocaine being thrown onto the top of the dresser. Cayton conceded that a
photograph introduced into evidence depicted the narcotics thrown onto the top of 
dresser by these men. 
4. Cayton also agreed that he did not recover the cellular telephones located in or on the
dresser or examine them to see to whom they belonged. 
5. Cayton conceded that he had obtained fingerprints from bags containing narcotics in
other cases, but stated that he did so under different circumstances. For example, he
had obtained fingerprints in cases where the house was empty.
6. In determining whether an accused knew that he possessed narcotics, the jury is
allowed to infer the accused's knowledge from his acts, conduct, remarks, and from
the surrounding circumstances. See Ortiz v. State, 930 S.W.2d 849, 852 (Tex.
App.--Tyler 1996, no pet.); Menchaca v. State, 901 S.W.2d 640, 652 (Tex. App.--El
Paso 1995, pet. ref'd). 
7. Although these additional independent facts and circumstances were once referred to
as "affirmative links," we now simply refer to them as "links." See Evans v. State,
202 S.W.3d 158, 161 n.9 (Tex. Crim. App. 2006).

8. This information was never brought out at trial, and neither party introduced evidence
regarding the identity of Red. 
9. In support of his challenge to the trial court's denial of his first motion to suppress,
appellant cites State v. Wester, 109 S.W.3d 824 (Tex. App.--Dallas 2003, no pet.). 
In Wester, there was no testimony from an officer who had been conducting
surveillance on the location in question, who had observed activity consistent with
narcotics activity at the location, and who had actually observed the eventual
informant at the location in question engage in some sort of transaction consistent
with illegal narcotics activity.